IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

CATHERINE PUGLISI,                )
                                  )
                    Plaintiff,    )
                                  )
     v.                           )     No.  05 C 6592
                                  )
CENTERPOINT PROPERTIES,           )
                                  )
                    Defendant.    )

                   MEMORANDUM OPINION AND ORDER

     This employment discrimination action by Catherine Puglisi ("Puglisi") against her ex-employer CenterPoint Properties Trust ("CenterPoint") has now reached the point, following entry by this Court of the parties' jointly-submitted Final Pretrial Order ("FPTO"), at which each party's numerous motions in limine has been responded to by her or its adversary. This Court's January 15, 2008 memorandum order (Dkt. 102) dispatched one of those motions--CenterPoint's Dkt. 93--at the threshold because it was so patently without merit, but the congeries of remaining motions is ready for resolution. This memorandum opinion and order will treat with all of Puglisi's motions save one, and this Court hopes to deal with CenterPoint's motions shortly.

     At the conclusion of its January 15 memorandum order this Court, which had not parsed the other motions to any extent, expressed the hope that the truly frivolous nature of the motion denied there did not foretoken any likelihood that the <u>noscitur a sociis</u> principle would taint any of CenterPoint's other motions.

But as the following discussion reflects, that has proved a vain hope in a number of other instances.

First, Puglisi's motion to exclude certain photographs (Dkt. 72 and 73), responded to by CenterPoint in Dkt. 116 and 124, is granted. This Court never sets a close of discovery timetable, with a later due date for filing of the FPTO, until both sides have confirmed that they can fit all of their discovery needs within that time frame. Indeed, in this instance the close of discovery was followed by CenterPoint's Fed. R. Civ. P. 56 motion for summary judgment, which this Court then denied fully three months after the close of discovery (it also set the FPTO timetable contemporaneously with that denial). CenterPoint has not identified any even marginally justifiable basis for shoehorning the disputed photographs into this case nearly five months after the close of discovery and 1-1/2 months after the denial of summary judgment.[1] CenterPoint must content itself with oral testimony by witnesses as to any matters that it believes the long-withheld photographs would disclose. This Puglisi motion is granted.

Puglisi's motion regarding the exclusion of evidence as to

---

[1] Indeed, Puglisi's counsel has adduced a showing of impermissible sandbagging on the part of CenterPoint's counsel: Some of the photographs produced in late October 2007 showed snow in the background, plainly demonstrating that the photographs had been taken months before, yet CenterPoint had not disclosed them to Puglisi during discovery or even in the course of the summary judgment motion.

her voluntarily-dismissed claims (Dkt. 74 and 75) was responded to by CenterPoint Dkt. 125. CenterPoint begins its response by stating:

In theory, defendant does not oppose the motion.

But then, after indicating some concern as to the precise scope of the motion as perceived by Puglisi, CenterPoint's counsel suggests that resolution of the matter via the current motion in limine is inappropriate on the premise that any ruling would have to be made contingent on Puglisi's testimony and evidence. This Court instead grants the motion because it is unopposed in principle, but without prejudice to the issue possibly being raised again at trial if plaintiff's proof is indeed at odds with her earlier dismissal of certain claims.

Puglisi's motion to exclude evidence related to a single adverse write-up issued to her in 1999 (Dkt. 76 and 77) has been responded to by CenterPoint Dkt. 117. Both because of the extended (nearly six year) time gap between that single write-up and Puglisi's January 2005 firing by a totally different superior (the alleged harasser), which fails to satisfy one critical component of Fed. R. Evid. ("Rule") 404(b) admissibility, and because the overriding Rule 403 balancing process is heavily weighted toward unfair prejudice far in excess of any probative value, the motion to bar is granted. This Court rejects the notion that, as CenterPoint would have it, an early write-up for

insubordination that carries with it a warning that further insubordination could result in discharge can operate to poise a Damoclean sword over an employee in perpetuity--a view under which another incident many years later, and involving a different supervisor, can somehow justify the later firing on an "we warned you" basis.  This is not to say that CenterPoint must be barred from a limited question in cross examination of a claim, if Puglisi asserts it at trial, that she uniformly "received excellent performance reviews and praise from the highest levels of Defendant's management" (Puglisi's Motion at 1).  But in candor, CenterPoint would do well to think twice about (1) the natural reaction of a factfinder to a question such as "Weren't you written up for claimed insubordination six years earlier?" and (2) the fact that Puglisi might then be enabled to introduce two exhibits containing particularly glowing praise from CenterPoint's executives at the very top of the corporate ladder.

Puglisi's next motion, to preclude evidence and arguments relating to the affirmative defense made potentially available under <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) and <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998)(Dkt. 78 and 79), has been responded to by CenterPoint Dkt. 118.  But in this instance it was Puglisi's direct supervisor Justine Hood ("Hood," the alleged harasser) who made the decision to fire

Puglisi. That termination certainly qualifies as the type of "tangible employment action" that Faragher, 524 U.S. at 807 teaches as rendering the affirmative defense unavailable. CenterPoint seeks to parse the matter differently, asserting that when the adverse action is retaliatory for an employee's complaining about harassment the action is "not based on sexual harassment." There is a snippet of language in Hill v. Am. Gen. Fin., Inc., 218 F.3d 639, 643 (7th Cir. 2000) that made that distinction in a case that was tried before the Faragher-Ellerth decisions and came to the Court of Appeals after those decisions had been handed down.[2] That is really a distinction without a difference, where (as here)(1) the claimed harasser is the actual decisionmaker in terminating Puglisi as a direct outgrowth of the claimed harassment and (2) Puglisi's lawsuit sounds in terms of both sexual harassment and retaliation.[3] And to the extent that CenterPoint relies on legitimate nonpretextual reasons for Puglisi's termination, that can comfortably be handled at trial

---

[2] CenterPoint seeks to adduce two other Court of Appeals opinions in purported support of its argument--Durkin v. City of Chicago, 341 F.3d 606, 611 (7th Cir. 2003) and Kampmier v. Emeritus Corp., 472 F.3d 930, 943 (7th Cir. 2007)--but those cases do not support CenterPoint's argument at all.

[3] What has just been said in the text is precisely the basis on which Judge John Daniel Tinder, then a District Judge but just recently confirmed and elevated to the Court of Appeals, rejected an employer's identical effort to call Hill to its aid (Gaskins v. Vencor, Inc., No. IP99-1122-C-T/G, 2001 WL 300517, at *19 (S.D. Ind. 2001)).

by the shaping of an appropriate verdict form (after all, if Puglisi strikes out on her sexual harassment claim and on the causal relationship between her complaints and her termination, CenterPoint wins in any event). This Puglisi motion is also granted.

Puglisi's next motion, to exclude evidence stemming from the affirmative defense identified in McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362-63 (1995)(Dkt. 80 and 81), has been responded to by CenterPoint Dkt. 119. For a change (somewhat refreshing under the circumstances), the CenterPoint response has merit, and Puglisi seeks to deflect the admission of such evidence by confirming that she does not intend to seek back pay beyond December 31, 2006, nor does she intend to seek front pay or reinstatement (CenterPoint's discovery, two years after firing Puglisi, that she had included a misrepresentation as to the grounds for her having left the employ of another company some nine years earlier, took place in January 2007). CenterPoint overreaches somewhat in other respects, however:

> 1. It urges that Puglisi must not seek damages for emotional distress that she assertedly sustained after the discovery date (as well as her having outlawed any claims for back pay, front pay and reinstatement). But no such cutoff should apply if the factfinder determines that Puglisi's emotional harm caused by a wrongful termination of

employment continued after the discovery date--that poses a question of fact that can also be addressed through jury instructions and a jury form.

2. Any attempted introduction of that false statement under Rule 608(b), as CenterPoint would have it (though its counsel mistakenly cites Rule 609(b)), is unpersuasive.

In reliance on Puglisi's already-referred-to disclaimer, this motion is also granted.

Next, Puglisi's motion to preclude any evidence of her husband's income (Dkt. 82 and 83) has been responded to by CenterPoint Dkt. 120. Here CenterPoint's position seems redolent of a chauvinistic approach in which a woman plaintiff is not entitled to be recognized as her own person in the employment world. While Puglisi identifies 42 U.S.C. §2000e-5(g)(1) as the predicate for her damages claim (in which she seeks to recover her lost wages and benefits less her own earnings, not those of her husband), CenterPoint points to her answer to its Interrogatory No. 9 in which she referred to emotional distress and "financial stress." That does not, as CenterPoint would have it, "open the door to the relevance of the inquiry into her family financial status and husband's income." Instead Puglisi's testimony as to such intangible harms will be appropriately cabined, so that any potential testimony as to her husband's income drops out in the determination of relevancy (to say

7

nothing of Rule 403 considerations).  Again Puglisi's motion is granted.

Puglisi's motion to preclude evidence that alleged harasser Hood did not also harass two other female CenterPoint employees (Dkt. 84 and 85) has been responded to by CenterPoint Dkt. 121. In terms of its frivolousness, that effort by CenterPoint is pretty much the legal equivalent of the one that this Court dispatched summarily in its January 15 memorandum order. Any such proposed testimony would clearly equate to an effort to introduce propensity evidence, directly at odds with Rule 404(b). Indeed, in this area the rejection of such evidence is further signaled by the special rule that Congress enacted as Rule 415, which adds to the general Rule 404(b) bar by creating a strong negative inference to the same effect. Once again Puglisi's motion is granted. This does not of course preclude the other female employees from testifying that they did not observe any instances of sexual harassment of Puglisi by Hood if and to the extent it is offered to rebut any testimony by Puglisi (if she advances it) that the alleged harassment was open and notorious.

Puglisi's motion to exclude a couple of items of e-mail correspondence with Karen Hatcher ("Hatcher")(Dkt. 86 and 87) has been responded to by CenterPoint Dkt. 122. Those challenged e-mails go back to October 2002, a couple of months after Hood had replaced Hatcher as Puglisi's supervisor, and they set out

8

several negative comments about Puglisi.  Puglisi objects that the e-mails are hearsay (and indeed they come squarely within Rule 801(c) to the extent that they are offered to prove the truth of Hatcher's negative statements), while CenterPoint seeks to take them out from under the hearsay rubric by urging that they show Hood's state of mind and her motive for terminating Puglisi's employment.  But the latter is extraordinarily unpersuasive, not simply because of the 2-1/2 year time gap between the e-mails and the termination of employment but--more importantly--because they were admittedly described in a February 12, <u>2007</u> letter from CenterPoint's lawyer to Puglisi's lawyer as having been "recently discovered from a computer hard drive and may be responsive to your discovery request."  It flouts credulity to contend that the e-mails formed part of Hood's mindset when she fired Puglisi in January 2005, given her failure to advert to them during her October 2006 deposition and the fact that they were buried in CenterPoint's electronic files until counsel dredged them up four months after that deposition.  Here too Puglisi's motion is granted.

Puglisi's motion to exclude the testimony of David Halleck ("Halleck")(Dkt. 107 and 108) has been responded to by CenterPoint Dkt. 123.  This motion poses a variant on CenterPoint's earlier-dismissed effort to adduce evidence from CenterPoint's two female employees about Hood's not having hit on

9

either of them, for now CenterPoint wants to evoke testimony from Halleck that he <u>did</u> have a sexual relationship with Hood and to vent his opinion that Hood is not homosexual or bisexual. Quite apart from the inadmissibility of the proposed content of such testimony, Puglisi's counsel first states that Halleck was never disclosed as a prospective witness until after the close of discovery, although when that issue was raised earlier this Court allowed Puglisi the opportunity to depose Halleck rather than excluding his testimony altogether. But in that respect Puglisi then points out that during Halleck's deposition (taken just a month ago) he revealed that he had first learned from CenterPoint <u>about a year earlier</u> (well before discovery closed) that he might be called to testify in the case. That sort of holdback game playing cannot be countenanced, and it could well serve as an independent ground for barring Halleck's testimony. But over and above that, Halleck's testimony is out of bounds in substantive terms-- reference need be made only to Rules 404(b) and 403 (with the balancing process under the latter Rule being heavily weighted against admissibility), and nothing has been offered up as to any purported Rule 702 qualifications that Halleck might have to allow him to opine on whether Hood might be what is colloquially termed "a switch hitter" in sexual terms. Again Puglisi has maintained her nearly perfect record in her battery of motions--this one is also granted.

Finally (at least for the present), Puglisi has filed under seal a motion to exclude evidence of certain medical records and medical conditions (Dkt. 99), to which CenterPoint has responded under seal (Dkt. 115). In that respect Puglisi hopes to testify as to intangible harms stemming from her alleged harassment by Hood: embarrassment, humiliation, anger, low self-confidence, low self-esteem, depression and loss of sleep, manifested in part through the exacerbation of an eating disorder. According to Puglisi, CenterPoint views that as an open invitation to introduce what Puglisi describes as her entire medical history, including "highly personal and irrelevant details of various physical conditions." For its part CenterPoint characterizes that as an improper "attempt to mask the extent of Plaintiff's medical history and its impact on her emotional state." This kind of conflict is not at all unusual in such situations, and it really cuts both ways:

   1. It is quite true that a plaintiff should not be permitted to put before the factfinder only those aspects of claimed emotional harm and similar intangible harms that favor his or her position, without revealing that plaintiff already had some preexisting problems that could cast a cloud on the issue of causation.

   2. On the other side of the coin, there is the familiar "eggshell" doctrine, in which the aggravation of a

> preexisting ailment or condition may be taken into account in determining damages.

What seems most appropriate under the circumstances is to defer the ultimate resolution of this motion until the issue can be vetted in the crucible of trial--but CenterPoint is forewarned that the extensive litany of matters set out in the second paragraph of page 3 of Puglisi's supporting memorandum and repeated at the top of page 4 of CenterPoint's response will not be permitted to be paraded before the jury in an obvious effort to dirty up Puglisi.[4]

According to this Court's notes, what has been said here leaves open in terms of Puglisi's motions in limine only the just-discussed Dkt. 99 and her motion to exclude certain exhibits (Dkt. 88 and 89, responded to by CenterPoint Dkt. 126). This opinion leaves the last-mentioned item open in the expectation that what has been said here should enable the parties to refine that motion by agreement as to the impact of the rulings here on the bulk of the exhibits referred to in that motion, so that any still-open items in that category can be narrowly focused to facilitate this Court's prompt disposition.

## Conclusion

Puglisi's motions advanced in Dkt. 72 through 87 and 107-08

---

[4] No details are of course included here because this opinion is not under seal, as are the motion and its response.

are granted. Those contained in Dkt. 88, 89 and 99 remain open for the reasons stated earlier.

_____
Milton I. Shadur
Senior United States District Judge

Date:   February 13, 2008